1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

|  |  |
|---|---|
| ROGER LARSEN, individually and on behalf of all others similarly situated, | ) ) ) ) ) Case No.: SACV 14-01865-CJC(JCGx) |
| Plaintiff, | ) ) ) ORDER DENYING WITH ) PREJUDICE PLAINTIFF'S MOTION ) FOR CLASS CERTIFICATION |
| v. | ) ) ) |
| VIZIO, INC., | ) ) ) |
| Defendant. | ) ) ) ) |

## I.  INTRODUCTION

Plaintiff Roger Larsen, on behalf of himself and all others similarly situated, brings this consumer protection class action against Defendant Vizio, Inc., in connection with Vizio's representations concerning the refresh rate of some of its televisions.  (*See generally* Dkt. 27 [First Amended Complaint, hereinafter "FAC"].)  Before the Court is

Dr. Larsen's motion for class certification.  (Dkt. 75 [Motion, hereinafter "Mot."].)  For the following reasons, the motion is DENIED WITH PREJUDICE.

## II.  BACKGROUND

Vizio is a California company and a seller of consumer electronics, including liquid-crystal display ("LCD") televisions.  (FAC ¶¶ 17–18.)  In October 2014, Dr. Larsen, who resides in Maine, bought a 50-inch Vizio E500i-B1 television from Amazon.com.  (*Id*. ¶¶ 12–14.)  Dr. Larsen alleges that prior to his purchase he reviewed advertisements and technical specifications created and disseminated by Vizio stating the television had a refresh rate of 120Hz.  (*Id*. ¶ 14.)  Refresh rate refers to the number of times per second an image is displayed on a television screen.  (*Id.* ¶ 1.)  Refresh rate is expressed in Hertz ("Hz"), defined by the International System of Units as cycles per second, meaning that a television with a refresh rate of 60Hz displays 60 images per second on its screen.  (*Id.*)  Dr. Larsen claims that refresh rates "are an important differentiator among competing televisions and are, likewise, a key component of pricing, just like resolution and screen size."  (*Id.*)

Currently, "video is not recorded at any more than 60 images per second."  (*Id.* ¶ 22.)  If too few images are displayed per second, viewers can see what is referred to as "motion blur," or "the apparent streaking of rapidly moving objects."  (*Id.* ¶ 23.)  "Motion blur can be evident in fast moving sports such as basketball or football."  (*Id.*)  However, through technology known as "motion interpolation," a television processor can create new, additional images to insert in between the recorded images to increase the number of images displayed per second.  (*Id.* ¶¶ 26–28.)

According to the FAC, Dr. Larsen relied on Vizio's representation that his television was 120Hz, but claims he was misled as the television actually had a refresh

rate of 60Hz.  (*Id.* ¶¶ 14–15.)  Dr. Larsen alleges that, but for Vizio's misrepresentations, he would not have purchased the television at the price he did and accordingly has suffered an ascertainable loss.  (*Id.* ¶ 16.)  Dr. Larsen further claims that for the last several years Vizio has systematically misrepresented the refresh rate of some of its LCD televisions (Vizio models E420i-A1, E550i-A0, E400i-B2, E400i-B0, E500i-B1, E600i-B3, E700i-B3, M401i-A3, E550VA, P502ui-B1, P702ui-B3, P602ui-B3, P552ui-B2, and XVT3D474SV, hereinafter the "Televisions") by "overstating, falsifying and obfuscating their actual refresh rates to improve sales."  (*Id.* ¶ 2.)  Specifically, Vizio allegedly "uses inferior, less expensive, backend technology to create more *non-unique* images, or simply misstates the refresh rate altogether."  (*Id.* ¶ 30 (emphasis in original).)  Vizio apparently uses a "scanning blacklight," which flashes an "unperceivable instant of black" between two identical images displayed in succession, thus "doubling" the number of images displayed per second.  (*Id.* ¶¶ 31–32.)  In this way, the FAC alleges that "Vizio is claiming to provide a 120Hz display, but is really providing nothing more than a 60Hz display displayed twice."  (*Id.* ¶ 33.)

Vizio does not contest that it uses backlight scanning, but claims that its practices are not misleading because its use of refresh rate expressed in Hz refers only to images per second, not *unique* images per second.  (Dkt. 94 [Opposition, hereinafter "Opp."] at 5.)  It further contends that Dr. Larsen "offers no evidence of any industry standard requiring a 120Hz TV to show 120 'unique' images."  (*Id.*)

Dr. Larsen brings this action on behalf of himself and a putative class of "[a]ll persons or entities in Maine who purchased one or more Televisions from November 1, 2010 until the present."  (*Id.* ¶ 37.)  He asserts the following causes of action: (1) violation of the Maine Unfair Trade Practices Act ("UTPA"), Maine Revised Statutes Title 5 §§ 205-A *et seq.*, (*id.* ¶¶ 45–57); (2) common law fraud, (*id.* ¶¶ 58–67);

(3) negligent misrepresentation, (*id.* ¶¶ 68–75); (4) unjust enrichment, (*id.* ¶¶ 76–80); and (5) breach of express warranty, (*id.* ¶¶ 81–86).

## III.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 23, district courts have broad discretion to determine whether a class should be certified.  *Armstrong v. Davis*, 275 F.3d 849, 871 n.28 (9th Cir. 2001).  As a threshold matter, "plaintiffs must first define an ascertainable and identifiable class."  *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 163 (C.D. Cal. 2002); *Schwartz v. Upper Deck Co.*, 183 F.R.D. 672, 679–80 (S.D. Cal. 1999) ("Although there is no explicit requirement concerning the class definition in FRCP 23, courts have held that the class must be adequately defined and clearly ascertainable before a class action may proceed.").

The party seeking class certification also bears the burden of showing that each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b) are met.  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  Rule 23 is not merely a pleading standard—a party seeking class certification must affirmatively demonstrate compliance with the Rule by proving the requirements in fact.  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Rule 23(a) provides that a case is appropriate for certification as a class action if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  These four requirements are often referred to as numerosity, commonality, typicality, and adequacy.  *See General Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982).

Rule 23(b) defines different types of classes.  *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2012).  In this case, Dr. Larsen seeks certification pursuant to Rule 23(b)(2) and Rule 23(b)(3).  (Mot. at 8.)  Rule 23(b)(2) permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Rule 23(b)(3) allows certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

## IV.  DISCUSSION

The Court first considers whether Dr. Larsen has met his burden concerning ascertainability and the Rule 23(a) requirements and then determines whether the class may be certified pursuant to Rule 23(b)(2) or Rule 23(b)(3).  For the reasons set forth below, class certification is not appropriate under Rule 23(b)(2) or 23(b)(3).

### A.  Ascertainable Class

To be ascertainable and identifiable, "the description of the class [must be] definite enough so that it is administratively feasible for the court to ascertain whether an individual is a member."  *O'Connor v. Boeing North American, Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998).  Dr. Larsen seeks to certify the following class: "All persons or entities in Maine who purchased one or more Televisions from November 1, 2010 until the present," and defines "Televisions" as "Vizio models E420i-A1, E550i-A0, E400i-B2, E400i-B0, E500i-B1, E600i-B3, E700i-B3, M401i-A3, E550VA, P502ui-B1, P702ui-B3, P602ui-B3, and P552ui-B2, and XVT3D474SV."  (Mot. at 1, 7; FAC ¶ 2 n.1; *id.* ¶ 37.)  Dr. Larsen argues that each of the Televisions features a model number that "will

objectively provide proof of membership in the proposed Class" and that Class members are likely to have saved receipts and kept the actual Televisions in question because televisions in general are "'big ticket,' memorable purchases." (Mot. at 9.) Dr. Larsen also argues that the class is ascertainable because each of the Televisions contained "uniform misrepresentations of double the actual refresh rate." (*Id.*)

Vizio does not appear to contest ascertainability, (*see generally* Opp.), but elsewhere in its opposition contends that its representations concerning refresh rate are not "uniform" because refresh rate language on the Televisions' packaging is varied. (Opp. at 8 (citing Dkt. 89 [hereinafter "Gregory Decl."] Exs. 22, 33).) For example, sometimes refresh rate is referred to as "effective refresh rate" and other times its packaging states that the refresh rate is "enhanced with backlight scanning" or "achieved by enhanced backlight scanning." (*Id.*) This does not undermine ascertainability, however, because all the packaging displays the term "120Hz" or "120Hz Refresh Rate" prominently, which is precisely what Dr. Larsen contends is misleading—other language such as "enhanced with backlight scanning" is almost always presented in much smaller, less prominent font underneath. (*See* Gregory Decl. Ex. 22.) The existence of the Televisions' model numbers, the packaging of the Televisions displaying the term "120Hz," and the "big ticket" nature of the Televisions make it administratively feasible to determine who is and is not a member of the class. The class is identifiable and ascertainable.

**B. Rule 23(a)**

*1. Numerosity*

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Plaintiffs are "not required to establish the precise number of class

members, as long as common sense and reasonable inferences from the available facts show that the numerosity requirement is met." *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768 PSG SSX, 2013 WL 5789237, at *3 (C.D. Cal. Oct. 25, 2013). "As a general rule, [however,] classes of 20 are too small, classes of 20–40 may or may not be big enough depending on the circumstances of each case, and classes of 40 or more are numerous enough." *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1095 (C.D. Cal. 2015) (quoting *Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988)) (modification in original). Dr. Larsen claims that Vizio sold over 331,000 units of the television model he purchased (E500i-B1) between November 2013 and July 2015, and at least 1,000 of those televisions were shipped to Maine. (Mot. at 10 (citing Dkt. 75-2 [hereinafter "Anderson Decl."] Ex. Z).) This estimate of at least 1,000 members does not even include the other thirteen models encompassed in Dr. Larsen's definition of the "Televisions" for the class. (*See id.*) Vizio presents no objection. (*See generally* Opp.) Since joinder of so many individuals would be impracticable, the Court finds that the numerosity requirement is met.

### 2. Commonality

Under Rule 23(a)(2), there must be "questions of law or fact common to the class." Commonality requires the plaintiff to "demonstrate that the class members 'have suffered the same injury,'" which "does not mean merely that they have all suffered a violation of the same provision of law." *Wal-Mart Stores*, 564 U.S. at 350 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). The "claims must depend upon a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "All questions of fact and law need not be common to satisfy the rule." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

Dr. Larsen argues that "each member of the proposed Class was exposed to the same misleading representations in [Vizio's] advertising and on the packaging that accompanied each and every Television sold throughout the class period." (Mot. at 11.) Accordingly, Dr. Larsen's claims seek to resolve one main question common to the entire class: whether Vizio's refresh rate representations for the Televisions were unfair, deceptive, or misleading. (*Id.*) Vizio does not appear to contest commonality, (*see generally* Opp.), and as with ascertainability, the fact that Vizio used varied language on its Televisions' packaging does not undermine commonality because Vizio uniformly represented that the Televisions had a refresh rate of "120Hz." The Court agrees that the factual circumstances surrounding the Vizio's use of "120Hz" in connection with its refresh rates, and the related legal question of whether that use was unfair, deceptive, or misleading, are common to all members of the class. The commonality requirement is also met.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." The purpose of the typicality requirement is to "assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "[A] named plaintiff's motion for class certification should not be granted if 'there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it.'" *Id.* (quoting *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990)).

//
//
//

Here, Dr. Larsen is a Maine resident who purchased a Vizio 50-inch model E500i-B1 120Hz[1] television from Amazon.com in October 2014 for $548.  (Gregory Decl. Ex. V; *id.* Ex. U at 8:4–5, 14:21–16:8, 28:9–10.)  Vizio argues that Dr. Larsen's claims are not typical because he "admitted that the '120Hz effective refresh rate enhanced with backlight scanning' marketing language on the Amazon website he visited, was not misleading, that he has never heard of 'motion interpolation,' and that he does not know what Hertz means."  (Opp. at 29 (internal citations omitted) (citing Gregory Decl. Ex. 33 at 76:14–82:12, 34:4–5, 43:2–9).)

These arguments oversimplify Dr. Larsen's testimony.  At Dr. Larsen's deposition, when asked if he remembered the wording on the Amazon.com page he observed describing his television's refresh rate, he testified that he did not think the description explained that the refresh rate was enhanced with backlight scanning.  (Gregory Decl. Ex. 33 at 76:14–19.)  When he was subsequently asked "*assuming* that the website said 120Hz effective refresh rate enhanced with backlight scanning, would you believe that that promotion is misleading?" Dr. Larsen replied "No."  (*Id.* at 76:20–24 (emphasis added).)  Dr. Larsen was then presented with a printout of Amazon's website he had printed out sometime *after* he had purchased his television, which said stated that the television had an "effective" refresh rate of 120Hz.  (*Id.* at 79:25–80:7.)  Defense counsel stated "I know this wasn't the exact page you looked at . . . but this would seem to imply that Amazon does advertise the effective refresh rate," to which Dr. Larsen replied "Yes." (*Id.* at 80: 14–17.)  However, Dr. Larsen maintained that on the page he visited prior to his purchase the website "just said 120Hz."  (*Id.* at 80:11.)  He further explained that, had he known his television was using backlight scanning, he would not have purchased it because "backlighting is a copy of the initial image, and it's not the next image, so it's not unique."  (*Id.* at 38:14–40:2.)

[1] In several places in his deposition, Dr. Larsen initially used the term "180Hz," but later clarified that he actually meant to say "120Hz."  (Gregory Decl. Ex. U at 37:10–23.)

Additionally, although Dr. Larsen did not know the technical definition of Hertz and had not heard of motion interpolation, he testified that the refresh rate was the most important factor in his decision to buy a television and that he understood refresh rate to mean "the number of unique images a viewer sees per second."  (Anderson Decl. Ex. U at 94:24–95:5.)  He was seeking a television that would be best for watching sports, (*id.* at 21:21–22), and his own research indicated that 120Hz provided a "better picture" for watching sports, (*id.* at 32:17–34:3).  Accordingly, the details of Dr. Larsen's particular purchase indicate that his interests do align with the rest of the class (namely, to obtain redress for Vizio's alleged misrepresentation that the Televisions were 120Hz).  The typicality requirement is also satisfied.

### 4.  Adequacy

Under Rule 23(a)(4)'s adequacy requirement, a plaintiff must establish that he "will fairly and adequately protect the interests of the class."  To determine whether a plaintiff's representation of a class meets this standard, the Court must ask: "(1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020); *see, e.g.*, *Drimmer v. WD-40 Co.*, 343 F. App'x 219, 221 (9th Cir. 2009) (affirming the district court's ruling that adequacy was not met due to "the combination of a personal relationship [and] landlord-tenant relationship" between the proposed class representative and his attorney, as well as the plaintiff's "inexplicable disinterest in pursuing all remedies available to him.").

Here, there is no indication from Vizio or otherwise that Dr. Larsen or his attorneys have any conflicts of interest with other members of the class.  (*See generally* Mot.; Opp.)  Dr. Larsen believes that his role in this action is to "help the other people

and myself that bought similar or equal models of this TV," is willing to travel to California to litigate this action, and can devote at least one hour per week to this case (and believes that he would likely be available to dedicate more time if necessary). (Anderson Decl. Ex. U at 70:21–71:23.)  Dr. Larsen's attorneys have submitted their resumes which demonstrate they have the experience and resources to serve as class counsel in this litigation.  (*Id.* Exs. AA, BB, CC.)  The adequacy requirement is satisfied.

## C.  Rule 23(b)(2)

Rule 23(b)(2) permits certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  The Supreme Court has clarified that "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant.  Similarly, it does not authorize class certification when each class member would be entitled to an individualized award of monetary damages."  *Wal-Mart Stores*, 564 U.S. at 360–61.  The Court need not decide whether the requirements of Rule 23(b)(2) have been met in this case, however, because Dr. Larsen does not have Article III standing to pursue injunctive relief.

### 1. Standing for Injunctive Relief

"In a class action, standing is satisfied if at least one named plaintiff meets the requirements."  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). The Supreme Court held in *Los Angeles v. Lyons*, 461 U.S. 95 (1983), that a plaintiff seeking injunctive relief must proffer evidence that there is "a sufficient likelihood that

[he] will be wronged in a similar way" in the future.  *Id.* at 111.  In other words, "[t]o establish standing for prospective injunctive relief, a plaintiff must demonstrate that 'he has suffered or is threatened with a 'concrete and particularized' legal harm . . . coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'"  *Bates*, 511 F.3d at 985 (quoting *Lyons*, 461 U.S. at 103).  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Dr. Larsen has not alleged that he intends to purchase the Televisions at issue in this litigation ever again.  (*See generally* FAC.)  Instead, he claims that if Vizio had "disclosed the true refresh rates of the Televisions, [Dr. Larsen] and Class members would not have purchased them, or would have paid significantly less for them."  (*Id.* ¶ 55.)  At Dr. Larsen's deposition, he also stated that had he known his television was using backlight scanning, he would not have purchased it because "backlighting is a copy of the initial image, and it's not the next image, so it's not unique."  (Gregory Decl. Ex. 33 at 38:14–40:2.)  These statements strongly suggests that he has no intention of ever buying the Televisions ever again, so he does not have the requisite standing under *Lyons*.

Some district courts in California have not applied the rule articulated in *Lyons* in the context of consumer protection or California Unfair Competition law cases, because otherwise "federal courts would be precluded from enjoining false advertising under California consumer protection laws because a plaintiff who had been injured would always be deemed to avoid the cause of the injury thereafter ('once bitten, twice shy') and would never have Article III standing."  *Henderson v. Gruma Corp.*, No. CV 10-04173, 2011 WL 1362188, at *7 (C.D. Cal. Apr. 11, 2011); *see also Koehler v. Litehouse, Inc.*, No. CV 12–04055 SI, 2012 WL 6217635 (N.D. Cal. Dec. 13, 2012)

(same); *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1045 (N.D. Cal. March 14, 2014) (stating in dicta that "[s]ome courts have disagreed with this reasoning [of the cases finding no Article III standing in this context], correctly recognizing the limitation this places on federal courts to enforce California's consumer laws.").  However, other district courts have determined that a plaintiff lacked Article III standing in the same circumstances.  *See, e.g.*, *Werdebaugh v. Blue Diamond Growers*, 12-cv-2724, 2014 WL 2191901, at *9 (N.D. Cal. May 23, 2014) ("[B]ecause Werdebaugh has not alleged, let alone provided evidentiary proof, that he intends or desires to purchase Blue Diamond almond milk products in the future, there is no likelihood of future injury to Plaintiff that is redressable through injunctive relief, and Plaintiff lacks standing to pursue that remedy."); *Forcellati v. Hyland's, Inc.*, No. CV 12-1983, 2014 WL 1410264, at *13 (April 9, 2014) ("Plaintiffs do not suggest that they are likely to purchase Defendants' products in the future.  Instead, they contend that the Article III standing requirement for injunctive relief does not apply in the consumer protection context.  Some district courts in this Circuit have taken this approach, holding that a plaintiff in a false advertising case retains standing to pursue injunctive relief so long as the products continue to be deceptively marketed and sold by the defendant.  These courts have reasoned that to hold otherwise would severely undermine the efficacy of California's consumer protection laws.  We decline to adopt this approach.  We find more persuasive the courts that have insisted that it is improper to carve out an exception to Article III's standing requirements to further the purpose of California consumer protection laws." (internal quotation marks and citation omitted)).

Having considered the perspectives of the many courts that have addressed this issue, this Court once again "agrees with those concluding that 'Article III's standing requirements take precedence over enforcement of state consumer protection laws.'" *Torrent v. Yakult U.S.A., Inc.*, No. SACV1500124CJCJCGX, 2016 WL 4844106, at *4 (C.D. Cal. Jan. 5, 2016), *reconsideration denied*, No. SACV1500124CJCJCGX, 2016

WL 6039188 (C.D. Cal. Mar. 7, 2016) (quoting *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 575 (C.D. Cal. 2014)); *see also Mason v. Nature's Innovation, Inc.*, 12-cv-2019, 2013 WL 1969957, at *4 (May 13, 2013) ("Guided by the Ninth Circuit's interpretation of Article III's standing requirements, this Court agrees with the courts that hold that a plaintiff does not have standing to seek prospective injunctive relief against a manufacturer or seller engaging in false or misleading advertising unless there is a likelihood that the plaintiff would suffer future harm from the defendant's conduct—i.e., the plaintiff is still interested in purchasing the product in question. . . . If an ADA plaintiff must demonstrate likely injury in the future, consumer plaintiffs such as the one in this case must as well.  There is no likelihood of injury in the future if a plaintiff has no interest in purchasing the product at issue again because it does not work or does not perform as advertised."); *Garrison v. Whole Foods Mkt. Grp., Inc.*, No. 13-5222, 2014 WL 2451290, at *5 (N.D. Cal. June 2, 2014) ("The named plaintiffs in this case allege that had they known the Whole Foods products they purchased contained SAPP, they would not have purchased them.  Now they know.  There is therefore no danger that they will be misled in the future.  It may very well be that the legislative intent behind California's consumer protection statutes would be best served by enjoining deceptive labeling.  But the power of federal courts is limited, and that power does not expand to accommodate the policy objectives underlying state law." (internal citations omitted)).  Because Dr. Larsen has not even alleged that he intends to by a Vizio Television in the future, let alone submitted evidence to that effect, the Court concludes that he lacks Article III standing to pursue injunctive relief here.  Accordingly, certification under Rule 23(b)(2) is inappropriate.

### D.  Rule 23(b)(3)

Rule 23(b)(3) permits certification where "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy" in light of, among other things, "the difficulties likely to be encountered in the management of a class action."  Fed. R. Civ. P. 23(b)(3).

### 1.  Predominance

The "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).  Predominance is a similar inquiry to commonality, but requires a heightened showing that facts and issues common to the class predominate over any individual issues that might be present.  *See* Fed. R. Civ. P. 23(b)(3); *Hanlon*, 150 F.3d at 1019.  The main concern is the "balance between individual and common issues."  *Mevorah v. Wells Fargo Home Mortg. (In re Wells Fargo Home Mortg. Overtime Pay Litig.)*, 571 F.3d 953, 959 (9th Cir. 2009).  Rule 23(b)(3) requires a showing that "questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class."  *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).  It "does *not* require a plaintiff seeking class certification to prove that each 'elemen[t] of [her] claim [is] susceptible to classwide proof.'"  *Id.* at 1196 (modifications in original).  This inquiry begins with the elements of the underlying causes of action.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011).

### i.  Maine UTPA

The parties' central dispute concerns Dr. Larsen's cause of action for violation of the Maine UTPA, which prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Me. Rev. Stat. Tit.

5 § 207.  Vizio argues that Dr. Larsen cannot establish reliance on Vizio's allegedly misleading statements on a class-wide basis.  (Opp. at 9.)  In *Sanford v. Nat'l Ass'n for the Self-Employed, Inc.*, 264 F.R.D. 11 (D. Me. 2010), a Maine district court interpreting the UTPA denied class certification because reliance was not subject to class-wide proof.  *Sanford* reasoned that although reliance is not "explicitly [] an element of a UTPA claim, reliance and causation are related concepts, and in the context of fraud, they are often intertwined. . . . [I]t is not possible for members of the class to prove that deceptive or misleading statements caused them damage unless they show that they relied on the statements."  *Id.* at 16.; *see also GxG Mgmt., LLC v. Young Bros. & Co.*, 457 F. Supp. 2d 47, 50–51 (D. Me. 2006) (granting summary judgment on UTPA claim where plaintiff could not show evidence of detrimental reliance).  An Arizona district court interpreting Maine's UTPA similarly found that the reliance requirement was not subject to class-wide proof and denied class certification because "a class member who never heard the allegedly fraudulent sales pitch, never visited [the defendant's] website, and never read its written materials could not be said to have relied on the false statements in those communications.  If a class member did not rely on the alleged fraudulent scheme, that class member cannot prove that the scheme caused his or her purchase and his or her injury."  *Martinelli v. Petland, Inc.*, 274 F.R.D. 658, 662 (D. Ariz. 2011).  Although the definition of "unfair" and "deceptive" under the UTPA may be established using a subjective *or* objective standard,[2] this does not abrogate the separate requirement laid out in *Sanford* that the plaintiff actually rely on such an unfair or deceptive practice.

Dr. Larsen has not offered any evidence that reliance can be demonstrated on a class-wide basis.  Vizio points out that reliance cannot be subject to common proof in this

---

[2] *See State v. Weinschenk*, 2005 ME 28, ¶ 16, 868 A.2d 200, 206 ("To justify a finding of unfairness, the act or practice: (1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition."  An "act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances.").

case, because the packaging of the Televisions varied, and some contained statements such as "enhanced with backlight scanning" or "achieved by enhanced backlight scanning." (Gregory Decl. Exs. 22, 33.) By Dr. Larsen's own admission, if a consumer had been subject to such language, he would likely not have been misled. (*Id* Ex. 33 at 76:14–19.) Vizio also points out that Dr. Larsen's case "is built not on some feature or definition that is commonly and widely understood by consumers, but on a technical definition of a technical feature," and there is no indication that consumers uniformly share Dr. Larsen's understanding of "120Hz refresh rate" to refer to a television that displays 120 unique images per second. (Opp. at 11–12.) Dr. Larsen responds that "reliance may be imputed where, as here, a defendant employs a pervasive marketing scheme and every Class member was exposed to Defendant's misrepresentations because they were included on the product packaging." (Dkt. 104 [hereinafter "Reply"] at 8 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 328 (2009); *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 978 (N.D. Cal. 2015); *Morgan v. AT & T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1258 (2009); and *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015).) This argument relies exclusively on California law, however, (*see id.*), and there is no support for its application to the Maine UTPA, particularly in light of Maine precedent indicating that such reliance may not be presumed. *See Sanford*, 264 F.R.D. at 16. Accordingly, individual issues regarding reliance will predominate for this cause of action under the Maine UTPA.[3]

ii. Fraud, Negligent Misrepresentation, and Breach of Express Warranty

Vizio argues that Dr. Larsen's claims for fraud, negligent misrepresentation, and breach of warranty cannot be resolved on a class-wide basis because individual issues of

---

[3] Since the Court finds that Dr. Larsen cannot establish reliance under the Maine UTPA on a class-wide basis, the Court need not address Vizio's other arguments regarding the Maine UTPA. (*See* Opp. at 6–19.)

reliance also predominate for these three claims.  (Opp. at 20.)  Individual reliance is an element of fraud, negligent misrepresentation, and breach of express warranty.  *Ramirez v. DeCoster*, 194 F.R.D. 348, 355 (D. Me. 2000) ("The fraud claims also require individualized determinations of whether there was a material misrepresentation to each worker, made with a specific intent to induce her to act, and whether she justifiably and detrimentally relied on that misrepresentation.  These claims are inappropriate for class certification."); *Millett v. Atl. Richfield Co.*, No. CIV.A. CV-98-555, 2000 WL 359979, at *12 (Me. Super. Mar. 2, 2000) ("The negligent misrepresentation and fraud claims require plaintiffs to prove that they justifiably relied upon the defendants' alleged misrepresentations and omissions . . . .  Proof of reliance is an individual issue which will have to be tried separately for each plaintiff in order for him or her to prevail on these causes of action."); *Maine Farmers Exch. v. McGillicuddy*, 1997 ME 153, ¶ 7, 697 A.2d 1266, 1268 ("Comments to [Me. Rev. Stat. tit. 11, § 2–313, the statute concerning express warranties] suggest that the requirement that the affirmation become part of the "basis of the bargain" is meant to continue the uniform sales act requirement that the purchaser must show reliance on the affirmation in order to make out a cause of action for a breach of warranty."); *Sullivan v. Young Bros. & Co.*, 91 F.3d 242, 249 (1st Cir. 1996) (same).[4]

As with the Maine UTPA, there is no justification for assuming reliance on the part of every class member for these claims.  Dr. Larsen offers no method of resolving the issue of reliance on a class-wide basis and again simply cites decisions interpreting California law for the proposition that reliance may be presumed.  (*See* Reply at 15–16).

---

[4] Dr. Larsen argues that it is "unsettled" whether reliance is required for an express warranty claim under Maine law, citing *Int'l Paper Co. v. Androscoggin Energy LLC*, 2002 WL 31507176, at *5 (N.D. Ill. Nov. 8, 2002).  (Reply at 15.)  *Int'l Paper Co.* is not on point, however, because in that case, an Illinois district court stated there was no Maine law finding that reliance was necessary for a breach of warranty claim where, unlike here, the existence of the express warranty was not in dispute.  *Int'l Paper Co.*, 2002 WL 31507176, at *5.  That case also does not cite *Maine Farmers* or *Sullivan*, which are on point here.

Accordingly, the predominance requirement is not met for Dr. Larsen's fraud, negligent misrepresentation, and breach of warranty causes of action.

### iii.  Unjust Enrichment

"Under Maine law, a claim for unjust enrichment has three elements: [1] a benefit conferred upon the defendant by the plaintiff; [2] an appreciation or knowledge by the defendant of the benefit; and [3] the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value." *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. 402, 407 (D. Me. 2010).  "The critical element to a claim for unjust enrichment in [] Maine [] is whether 'the defendant's retention of the benefit is unjust.'" *Id.* at 418.

Vizio argues that common issues do not predominate for Dr. Larsen's unjust enrichment claim because it turns on each individual situation—Vizio believes that it would not be unjust for Vizio to retain a benefit from consumers who are happy with their televisions and do not care about refresh rates or "rejected the downsides of motion interpolation."  (Opp. at 21.)  The Court agrees.  Although "injury and causation are not elements of claims for unjust enrichment in Maine[, plaintiffs must establish] why, absent injury and causation, the Defendants' 'retention of the benefit is unjust.'"  *In re Light Cigarettes Mktg. Sales Practices Litig.*, 271 F.R.D. at 418.  Since Dr. Larsen's claims are premised on Vizio's misleading *representations* and involve potentially varied understandings of the term "120Hz," the Court agrees that Dr. Larsen's claim for unjust enrichment is not appropriate for class-wide resolution.  *See In re ConAgra* Foods, 90 F. Supp. 3d at 995 ("[I]ndividualized inquiries concerning the reasons each class member purchased Wesson Oils will be required in order to determine whether ConAgra's retention of the purported price premium would be 'unjust' or otherwise inequitable . . . .

[The putative class] includes all consumers who purchased Wesson Oils during the class period—whether or not they relied on the '100% Natural' label and regardless of the meaning they ascribed to the term.").5

iv. Damages Model for All Claims

In evaluating class certification under Rule 23(b)(3)'s predominance requirement, the Court must determine whether damages are "capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013). In *Comcast,* the Supreme Court held that damages calculations "need not be exact . . . but at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Id.* at 1433. In other words, Dr. Larsen "must be able to isolate the price premium associated with misleading consumers in that particular fashion." *In re ConAgra Foods*, 302 F.R.D. at 579. Even after *Comcast*, "the presence of *individualized* damages cannot, by itself, defeat class certification under Rule 23(b)(3)." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (emphasis added); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015), *cert. denied,* 136 S. Ct. 2410 (2016) (reaffirming that differences in damage calculations do not defeat class certification after *Comcast*.) Nevertheless, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory. If the model does not even attempt to do that, it

---

5 Although Dr. Larsen identifies cases where courts found that common issues did predominate for an unjust enrichment claim, those cases are distinguishable—they involved defective products, failure to honor refinanced insurance rates, or other instances where class members suffered clear-cut and identical harm, regardless of their subjective experiences. (Reply at 17 (citing *Campbell v. First Am. Title Ins. Co.*, 269 F.R.D. 68, 78 (D. Me. 2010); *Beck-Ellman v. Kaz USA, Inc.*, 283 F.R.D. 558, 568 (S.D. Cal. 2012); *Cartwright v. Viking Industries, Inc.*, 2009 WL 2982887, at *12–13 (E.D. Cal. Sep. 14, 2009); *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 330 (C.D. Cal. 2015); *Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953; *In re Abbott Labs. Norvir Anti–Trust Litig.*, 2007 WL 1689899, at *9–10 (N.D. Cal. June 11, 2007); *In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 669 (S.D. Cal. 2010); and *Rivera v. Bio Engineered Supplements & Nutrition, Inc.*, 2008 WL 4906433, at *13 (C.D. Cal. Nov. 13, 2008)).)

cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Comcast*, 133 S. Ct. at 1433; *see also Leyva*, 716 F.3d at 514 ("[P]laintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.").

Dr. Larsen contends that there are two "readily accessible damages models available to the Court."  (Mot. at 21.)  First, he offers a "price premium that can be traced to the use of false refresh rates through consumer surveys and conjoint analysis," which "will then apply across the Class based on the differential of the advertised and actual refresh rates."  (*Id.*)  In support, Dr. Larsen submits the expert report of Dr. Elizabeth Howlett, who conducted a choice-based conjoint analysis survey of 600 consumers who purchased Vizio televisions.  (Anderson Decl. Ex. DD [hereinafter "Howlett Decl."] ¶ 26.)  "Conjoint analysis is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes—often called the market's willingness to pay."  *In re NJOY*, 120 F. Supp. 3d at 1073.  In Dr. Howlett's survey, consumers were shown fifteen sets of products and were asked to indicate which one they would choose to purchase—each set of products was defined by certain attributes (refresh rate, picture resolution, manufacturer warranty, and price).  (Howlett Decl. ¶ 35.)  Dr. Howlett contends that "[b]y analyzing how consumers express their preferences for profiles within the choice sets, it is possible to quantify the impact each attribute has on overall product preferences."  (*Id.* ¶ 27.)  Based on her survey results, Dr. Howlett concluded that "[p]urchasers of Vizio televisions place a significant price premium on refresh rate.  More specifically, consumers are willing to pay substantially more ($77.19) for a television with a 120Hz refresh rate compared to an identical product with an inferior refresh rate (60Hz)."  (*Id.* at ¶ 18.)

Dr. Howlett's damages model is insufficient for several reasons.  As an initial matter, it compares "60Hz" televisions with "120Hz" televisions, with no indication of

how backlight scanning and motion interpolation technology factor into such television

models.  (*See* Howlett Decl. ¶ 46.)  The use of backlight scanning, and whether it can turn

a 60Hz television into a 120Hz television, is at the core of the parties' dispute.  Thus, Dr.

Howlett's model by design measures the wrong figure—instead of isolating the price

premium between a 120Hz television achieved through motion interpolation and a

purported 120Hz television achieved through backlight scanning, it measures the price

premium between a 120Hz television (presumably achieved through motion

interpolation) and a regular 60Hz television (without backlight scanning).  This damages

model is not consistent with Dr. Larsen's theory of liability.

In failing to specify what technology the televisions in her study use, Dr. Howlett's

model also makes several unexplained assumptions.  First, she assumes that there is a

consumer-wide or industry-wide understanding of "120Hz."  She does not explain this

underlying assumption, and the parties debate whether there is in fact such a common

understanding of the meaning of "120Hz."  (Opp. at 5; Reply at 3.)  While Dr. Larsen has

presented evidence demonstrating that some retailers are confused about Vizio's refresh

rate representations, (*see* Anderson Decl. Exs. H, I, J), that evidence does not establish a

common understanding about the meaning of "120Hz."  Dr. Larsen also provides

comments by Rex Leetham, a corporate television buyer for RC Willey Home

Furnishings, but this lone opinion is also insufficient.  (Mot. at 3 (citing Anderson Decl.

Ex. K ("Samsung claims 'Clear Motion Rate 480' they do not put hertz in because that

would be false advertising.  Vizio says things like 240Hz Effective Scan Rate' which is

not accurate.  It could be 120 Effective Scan Rate or Clear Action 120, or 120 Clear

Action.  An effective rate should not incorporate the Hz nomenclature.  I called Vizio on

this 8 months ago when they claimed the i series was 120Hz on their website.  I finally

got the tech support people to admit in writing that they are 60Hz TVs with 120 effective

scan rate.  Honestly, I'm surprised there hasn't been a class action against the company for false advertising.")).)[6]

Relatedly, Dr. Howlett's model assumes that there is *no* difference between a 60Hz television without backlight scanning and a 60Hz television with backlight scanning (what Vizio contends is 120Hz)—in other words, that there is no value added to a television by implementing backlight scanning.  Although Larson argues that backlight scanning is an *inferior* technology, (FAC ¶ 30), that does not mean that it is worthless, and there is no evidence or allegation suggesting that it has *zero* impact on a customer's viewing experience.

Dr. Howlett's model also generates a subjective "willingness to pay" amount that fails to take into account the reality of the market.  Conjoint analysis can, if designed appropriately, measure the relative value consumers ascribe to a particular attribute, but it does not turn that subjective amount "into an absolute valuation to be awarded as damages."  *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *4 (C.D. Cal. Dec. 18, 2014).  The price of a product "is a combination of market demand and market supply."  *In re NJOY*, 120 F. Supp. 3d at 1119.  "By looking only to consumer demand while ignoring supply, [conjoint analysis] converts the lost-expectation theory from an objective evaluation of relative fair market values to a seemingly subjective inquiry of what an average consumer wants.  The Court has found no case holding that a consumer may recover based on consumers' willingness to pay irrespective of what would happen in a functioning market (i.e. what could be called sellers' willingness to sell)."  *Saavedra*, 2014 WL 7338930, at *5; *see also In re NJOY*, 120 F. Supp. 3d at 1120 (The conjoint analysis model presented "ignore[d] the price for which

---

[6] Dr. Howlett also instructed the survey respondents at the outset that televisions differ on several "important" dimensions, including refresh rate.  (Dkt. 83-3 at 8.)  In other words, she "le[d] respondents to presuppose" one of the "question[s] she is supposedly trying to answer"—that refresh rate is an important feature to consumers in purchasing televisions.  (Dkt. 91 Ex. 4 ¶ 25(a).)

NJOY is willing to sell its products, what other [] manufacturers say about their products, and the prices at which those entities are willing to sell their products.  This does not suffice under *Comcast*.").  Dr. Howlett's model was based entirely on consumers "willingness to pay" for certain attributes, with no consideration of whether this subjective price is realistic in light of market price and availability.

In fact, Dr. Howlett's survey resulted in a willingness to pay figure of $295.32 (Howlett Decl. ¶ 46), which "would represent a significant portion of the purchase price for at least some Vizio TVs."  (*See, e.g.*, Dkt. 91 Ex. 4 [Declaration of Dominique M. Hanssens, hereinafter "Hanssens Decl."] ¶¶ 92–93 ("I first compare Dr. Howlett's estimates with total purchase prices of Vizio TVs as specified in her study—Vizio Smart TV models with 48" screen, 120Hz effective refresh rate, and 1080p high definition screen.  I found two such models currently on the market, Vizio E48-D0 and D48-D0, both currently listed on Vizio's website as selling for $379.99.   If Dr. Howlett's [willingness to pay] estimate of $295.32 for refresh rate were valid, it would imply that [willingness to pay] for refresh rate represents 78% of the total price of these TVs.").)

Dr. Howlett then applied certain arbitrary reductions to this $295.32 figure, which further undermines the appropriateness of her model.  She reduced the $295.32 by 40% to take into account "the 60.1% associated with Smart technology," arriving at $177.19. (Howlett Decl. ¶ 46.)  She then deducted $100 from this figure, explaining that "the price premium associate [sic] with the larger screen TV must be considered.  So taking into account the premium associated with screen size, the overall premium associated with refresh rate is $77.19."  (*Id.*)  Dr. Howlett does not adequately explain the basis of either of these deductions.  (*See id.* ¶¶ 45–46.)  For example—why does she adjust for "smart technology" and "screen size," but no other relevant features?  (*See* Hanssens Decl. ¶¶

50–60 (providing additional criticisms of Dr. Howlett's "deductions").)  Simply put, Dr. Howlett's model is not consistent with Dr. Larsen's theory of liability.[7]

As an alternative damages model, Dr. Larsen suggests a "back-stop" theory related to manufacturing cost, defined as the "ascertainable cost differential between actually improving refresh rate and using backlight scanning."  (Mot. at 21.)  Dr. Larsen says that "DisplaySearch reports" purchased by Vizio through the class period can be used to "expressly trace the premiums associated with higher refresh rates at various television sizes," and that "business models produced by Defendant can also be used to determine the cost associated with producing the Televisions with the promised refresh rates."  *Id.*  Dr. Larsen is "confident" that this number would understate the damages to consumers.  *Id.*  As an initial matter, a model that is certain to understate damages is not one that is consistent with Dr. Larsen's theory of liability, and it would not be fair to class members for the Court to adopt such a model.  Additionally, the DisplaySearch reports are created by a third-party company and only display "market trends in the cost of native panels to [third party] manufacturers of TVs," as opposed to Vizio's actual costs.  (Opp. at 26–27 (emphasis omitted).)  Nor is it clear what "business models" Dr. Larsen is referring to.  Vizio responds that in forming its business models it approaches its partner television manufacturers with a "goal price point at which it is trying to sell a given TV" and "does not break the price point down into component costs," (*id.* at 27), and Dr. Larsen does not provide any evidence to the contrary, (*see* Reply at 17–19).  Ultimately, neither the DisplaySearch reports nor the vaguely referenced "business models" accurately calculate the price premium associated with the alleged misrepresentation.

Prior to the hearing, the Court requested supplemental briefing from the parties regarding the difference between the price class members paid for the Televisions and the

---

[7] Vizio's motion to exclude the declaration of Dr. Howlett, (Dkts. 81, 82, 83), is DENIED AS MOOT.

market price of "comparable" 60Hz televisions in the market.  (Dkt. 121.)  Vizio

responded that there are two general methods through which plaintiffs calculate a price

premium through the use of actual market prices of comparable products: comparing the

price class members paid with that of a "comparator" product, and the use of "hedonic

regression."[8]  (Dkt. 123 at 1–2.)  Vizio correctly noted that the "comparator" model

requires the existence of at least two products that are identical but for the disputed

feature.  (*Id.* at 3 (citing *Alargin v. Maybelline LLC*, 300 F.R.D. 444, 460 (S.D. Cal.

2014) ("To establish that any difference in price is attributed solely to the alleged

misrepresentation, the Court must use a product, exactly the same but without the 24 hour

claim. . . . The Court would have to control and neutralize all other product differences.

Such a task is nearly impossible as no two products are completely identical.")).)  Dr.

Larsen provided no evidence that a single "comparator" product [i.e., a comparable 60Hz

television with backlight scanning] exists for each of the Televisions at issue in this case.

 

In his supplemental briefing, Dr. Larsen simply stated that if his proposed models

are insufficient, Dr. Howlett's model may be combined with a hedonic regression model,

or hedonic regression analysis could be "entirely substituted."  (Dkt. 122 at 3.)  At the

hearing, Dr. Larsen's counsel represented that they have begun preliminary discussions

with Colin Weir, who could perform hedonic regression.  However, Dr. Larsen did not

provide any evidence or data to support this model, nor did he explain exactly how such a

model would be constructed.  (*See id.*)  He has failed to present a class-wide damages

model consistent with his theory of liability, preventing class certification under Rule

23(b)(3).

---

[8] Hedonic regression is a "statistical analysis in which actual retail prices and attributes of many similar
products (here, TVs) are analyzed in an attempt to isolate the effect of a specific attribute (here, refresh
rate) on price.  (Dkt. 123 at 5.)

Dr. Larsen also asks that if his proposed methodologies are insufficient under *Comcast*, the Court grant him "time to make an additional submission relating to hedonic regression analysis or conjoint analysis that addresses concerns expressed by the Court." (*Id.* at 4–5.)  However, as Vizio points out, hedonic regression would require Dr. Larsen to produce additional data sufficient to allow an expert to perform hedonic regression analysis, and no such data was provided to Vizio prior to the discovery cut-off.  (Dkt. 123 at 6–7.)  This case has been pending for about two and a half years and Dr. Larsen has had ample time and opportunity to conduct discovery and fact-finding.  The Court cannot continue to keep this case pending while he searches for a damages model that would satisfy *Comcast*, nor would additional time allow Dr. Larsen to overcome the other predominance issues the Court identified regarding his five causes of action.  Accordingly, Dr. Larsen's motion for class certification must be DENIED WITH PREJUDICE.

**V.  CONCLUSION**

For the foregoing reasons, Plaintiff's motion for class certification is DENIED WITH PREJUDICE.

DATED:     April 27, 2017

_____

CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE